**UPS AIRLINES, Appellant,**

v.

**Edwin Corey WEST; Honorable James L. Kerr, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2011–SC–000295–WC.

Supreme Court of Kentucky.

May 24, 2012.

Kenneth J. Dietz, Lucas & Dietz, PLLC, Florence, KY, Lance O. Yeager, Lucas & Dietz, PLLC, Louisville, KY, Counsel for Appellant, UPS Airlines.

---

**16.** I believe that dismissal without prejudice is appropriate because Bucher's petition was not validly adjudicated.

Scott Mitchell Miller, Priddy, Cutler, Miller & Meade, PLLC, Louisville, KY, Counsel for Appellee, Edwin Corey West.

## OPINION OF THE COURT

This appeal concerns the extent to which KRS 342.730(6) entitles UPS Airlines to receive credit against its liability under KRS 342.730(1) for the payment of Loss of License benefits that are the product of a collective bargaining agreement between UPS and the Independent Pilots Association (IPA) of which the claimant is a member.

Reversing an Administrative Law Judge's decision, the Workers' Compensation Board found that KRS 342.730(6) did not entitle UPS to a dollar-for-dollar credit against the claimant's past due and future income benefits for all benefits paid under a "Loss of License Insurance" plan. The Board relied on *GAF Corp. v. Barnes*[1] to determine that Loss of License benefits were the product of a collective bargaining agreement and, thus, were not funded exclusively by the employer as required by KRS 342.730(6). The Court of Appeals affirmed.

We affirm to the extent that UPS was not entitled to a dollar-for-dollar credit, but we reverse with respect to the legal conclusion that Loss of License benefits were not funded exclusively by the employer for the purposes of KRS 342.730(6) because they were bargained-for benefits. Enacted in an apparent response to *GAF v. Barnes*, KRS 342.730(6) entitles UPS to credit its liability for past due or future income benefits based on the payment of Loss of License benefits, but it does so only to the extent that Loss of License benefits duplicate, *i.e.*, "overlap" workers' compensation benefits. KRS 342.730(6) does not entitle UPS to credit the overpayment of voluntary benefits against future income benefits.

The claimant, a UPS Airlines pilot, sustained a work-related back injury in 2003 for which he underwent a lumbar fusion. UPS paid voluntary temporary total disability (TTD) benefits with respect to the surgery through December 21, 2005 and also paid Loss of License benefits during part of that period. The claimant returned to work on December 22, 2005 and continued to work when his claim was decided.

UPS paid the entire premium for the Loss of License plan, which entitled an IPA-member pilot to receive 66 2/3% of the member's "pay period guarantee" for up to 20 pay periods if the member was unable to exercise the privileges of an FAA medical certificate due to medical problems and remained out of work after a six-month waiting period. A pay period was 28 days and the benefit was paid bi-weekly. The plan contained no internal offset that required a pilot who received workers' compensation benefits to reimburse UPS for Loss of License benefits.

The claimant's average weekly wage as a pilot was $2,377.14. KRS 342.730(1)(a) limits total disability benefits to a maximum of 66 2/3% of the injured worker's average weekly wage or to the state's average weekly wage. As a consequence, the claimant received the maximum TTD benefit of $571.42 per week, which was about 24% of his average weekly wage, during the period from October 18, 2004 through December 21, 2005. UPS records indicated that he received Loss of License benefits of $2,946.75 bi-weekly, *i.e.*, $1,473.38 per week, from May 9, 2005 through December 19, 2005 and received an additional $841.42 for the period from December 20, 2005 through January 3,

1.  906 S.W.2d 353 (Ky.1995).

2006, for a total of $50,936.67. The combined weekly benefits totaled $2,044.80 during the weeks that both were paid, which was about 86% of his average weekly wage. Unlike wages, workers' compensation benefits are not subject to income and payroll taxes. Income benefits received for personal injury or sickness through an accident or health plan for which the worker does not pay the premium generally are taxable.

UPS sought leave to credit the claimant's Loss of License benefits against its liability for income benefits. It reasoned that KRS 342.730(6) permitted a credit against "[a]ll income benefits," which included both past due and future benefits awarded under KRS 342.730(1). Thus, having overpaid its liability for TTD benefits by failing to take credit for Loss of License benefits, UPS argued that KRS 342.730(6) entitled it to credit the overpayment against past-due and future benefits payable under any permanent partial disability award the claimant received.

The claimant asserted that Loss of License benefits did not fall within the purview of KRS 342.730(6) because they were unrelated to workers' compensation and were a bargained-for benefit. He reasoned that they were not funded exclusively by UPS because IPA members gave up other types of benefits in exchange for them. He argued in the alternative that UPS should at most receive credit for those periods that Loss of License benefits overlapped benefits awarded under KRS 342.730(1).

Having bifurcated the claim at the parties' request, the ALJ considered only whether UPS was entitled to credit for the disputed benefits and, if so, the amount of the credit. The parties eventually stipulated to a 20% permanent impairment rating, which entitled the claimant to permanent partial disability benefits of $85.71 per week for 425 weeks beginning on December 22, 2005. The ALJ awarded UPS a dollar-for-dollar credit in the amount of $50,936.67 against "any and all income benefits ... including future income benefits" for all of the benefits paid under the "Loss of License" plan.

The claimant appealed following the denial of his petition for reconsideration, reiterating the arguments he made to the ALJ. He noted that the dollar-for-dollar credit would offset his entire permanent partial disability award although Loss of License benefits ceased when he returned to work.

The Board and the Court of Appeals relied on *GAF Corp. v. Barnes* to determine that Loss of License benefits were not funded exclusively by the employer because they were the product of a collective bargaining agreement. Thus, KRS 342.730(6) did not entitle UPS to a credit.

*GAF Corp.* was decided in 1995, at which time Chapter 342 did not provide an offset based on the receipt of private employer-funded income benefits. At issue was whether disability retirement benefits funded entirely by the employer could properly be credited against benefits awarded under KRS 342.730(1). The court determined that the employer failed to prove its entitlement because the private benefits were the product of a collectively-bargained agreement and not only did the terms of the plan contain no reference to a credit, they also failed to provide substantial evidence that the private benefits fulfilled the same purpose as workers' compensation.[2] The court determined subsequently in *Williams v. Eastern Coal*

2. *Id.* at 356.

*Corporation*[3] that a credit against statutorily-mandated benefits based on the receipt of benefits from a private disability or sickness and accident plan must be authorized by statute. Otherwise, any credit must occur against benefits provided by the private plan.

KRS 342.730(6) was enacted effective December 12, 1996. It provides as follows:

All income benefits otherwise payable pursuant to this chapter shall be offset by payments made under an exclusively employer-funded disability or sickness and accident plan which extends income benefits for the same disability covered by this chapter, except where the employer-funded plan contains an internal offset provision for workers' compensation benefits which is inconsistent with this provision.

■ The ALJ construed KRS 342.730(6) as entitling UPS to credit for all of the claimant's Loss of License benefits, which had the effect of negating his entitlement under their agreement to benefits equaling 66 2/3% of his "pay period guarantee" for up to 20 four-week pay periods. It also credited UPS's overpayment of TTD against future income benefits. The Board and the Court of Appeals construed the term "exclusively employer-funded" as not including bargained-for benefits. We conclude that neither construction is correct.

■ Our role when construing a statute is to effectuate its purpose.[4] KRS 342.730(6) appears to have been enacted in response to *GAF Corp. v. Barnes*. Its purpose is to avoid a duplication of income-replacement benefits with respect to injuries that occur after its effective date by permitting private contractual benefits that duplicate benefits awarded under KRS 342.730(1) to offset them. KRS 342.730(6) addresses the reality that many employer-funded plans contain an internal offset for workers' compensation benefits but that others do not. Moreover, many, such as the UPS plan, include neither an internal offset nor a provision stating explicitly that the private benefit is intended entirely as a supplement to workers' compensation coverage. KRS 342.730(6) fills the gap by requiring an offset.

Nothing in KRS 342.730(6) evinces a legislative intent to negate the effect of an employer's agreement to entirely fund a weekly benefit greater than the maximum allowed by KRS 342.730(1). Income benefits paid under a private plan duplicate income benefits awarded for the same disability under KRS 342.730(1) only to the extent that they overlap the statutory benefit, *i.e.*, only to the extent that they are less than or equal to the workers' compensation benefit; cover the same period of time; and are not themselves offset by the receipt of benefits under KRS 342.730(1). We conclude, therefore, that KRS 342.730(6) does not entitle an employer who agrees to fund a weekly benefit greater than the maximum workers' compensation benefit to credit the contractual excess against its workers' compensation liability. To do so would deprive the injured worker of the benefit of the parties' bargain.

Consistent with KRS 342.730(6)'s purpose, the words "[a]ll income benefits otherwise payable" allow a credit against future as well as past-due income benefits due to an overlap with private benefits. In

---

**3.** 952 S.W.2d 696, 698–700 (Ky.1997) (overruling *Beth–Elkhorn Corp. v. Lucas*, 670 S.W.2d 480 (Ky.App.1983), and *Conkwright v. Rockwell International*, 920 S.W.2d 90 (Ky.App.1996).

**4.** KRS 446.080.

order to encourage employers to pay income benefits voluntarily, when liability is clear, employers have been allowed to credit an overpayment of voluntary TTD benefits against past-due but not against future income benefits.[5] Although KRS 342.730(6) allows an employer to receive credit for overlapping past-due and future benefits, we are not convinced that it allows an overpayment of voluntary TTD benefits to offset the worker's future income benefits. We reach that conclusion because although the statute refers to "[a]ll income benefits," it provides an offset only for "payments" rather than for "all payments" made under an exclusively employer-funded plan. Likewise, it refers to an offset against benefits that are "otherwise payable" rather than benefits that are "paid or payable."

Stated plainly, KRS 342.730(6) entitles an employer to credit disability or sickness and accident benefits that it funds exclusively against its liability under KRS 342.730(1) for overlapping past-due or future income benefits that are based on the same disability. It does not entitle an employer to credit the overpayment of voluntary income benefits against future income benefits.

UPS and the claimant's labor union were charged with knowledge of KRS 342.730(6) when they negotiated their agreement concerning Loss of License Insurance. The agreement did not contain an internal offset for workers' compensation benefits but also did not contain a statement indicating that plan benefits were intended *entirely* as a supplement to workers' compensation. We conclude, therefore, that KRS 342.730(6) entitled UPS to credit Loss of License benefits against its liability for benefits otherwise payable under KRS 342.730(1) to the extent that the two benefits overlapped because Loss of License benefits were funded exclusively by the employer; they covered the same disability for which the claimant received benefits under KRS 342.730(1); and they were not offset under the plan based on his receipt of workers' compensation benefits.

The Loss of License benefit to which the parties agreed exceeded the claimant's benefit under KRS 342.730(1) during the weeks that they overlapped. KRS 342.730(6) entitled UPS to credit overlapping Loss of License benefits against the TTD benefits that were otherwise payable, but it did not entitle UPS to take credit for the contractual excess. Having failed to credit the private benefits when making TTD payments, UPS was entitled to credit the overpayment of TTD against past-due benefits, if any, but was not entitled to take credit against its liability for future partial disability benefits.

The decision of the Court of Appeals is hereby affirmed in part and reversed in part and this claim is remanded to the ALJ to award the appropriate credit.

All sitting. MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCHRODER, and VENTERS, JJ., concur.

SCOTT, J., dissents by separate opinion in which NOBLE, J., joins.

SCOTT, J., dissenting:

I must respectfully dissent because the majority's opinion invalidates the contractual intent of the parties and thereby denies West the benefit of his union's bargain with UPS.

---

5. *See, for example, Triangle Insulation and Sheet Metal Co. v. Stratemeyer,* 782 S.W.2d 628 (Ky.1990) (entire overpayment of TTD may be credited but only against past-due benefits).

West, a pilot, earned an average weekly wage of $2,377.14 prior to sustaining his work-related back injury in 2003. Thereafter, during the existence of his injury, he received $571.42 per week in workers' compensation—an amount equivalent to only 24% of his average wage when working. However, under his Loss of License Benefit plan, negotiated between the Independent Pilots Association (IPA) and UPS, West was entitled to an additional $1,473.35 per week once he had been off work and unable to use his FAA certificate to fly for six months.

Thus, prior to the majority's opinion, West was able to recoup roughly 86% of his average weekly wage from May 9, 2005 through December 19, 2005 due both to his compensation and the loss of use of his FAA certificate.[6] The majority's opinion now holds that UPS is entitled to a credit against the Loss of License benefit for its workers' compensation liability.

I simply disagree and would affirm the unanimous determination of the Court of Appeals' panel that UPS was not entitled to a credit under our existing precedent because the Loss of License benefits were not exclusively funded by UPS—they were traded for (and thus paid for) by the union in the contract negotiations. Accordingly, in no sense of the word was it an "exclusively employer-funded plan" as required by KRS 342.730(6).

In fact, this Court effectively said so in *GAF Corp. v. Barnes*, 906 S.W.2d 353 (Ky. 1995). In *Barnes*, the employee received a monthly disability retirement benefit under an employer-funded pension plan, which was encompassed by a collective bargaining agreement between the employer and the employee's union. 906 S.W.2d at 354. Although it maintained that, as a general rule, an employer-funded disability plan should be interpreted to circumvent duplicate benefits, the Court also noted that "an employee benefit which is the product of a collective bargaining process ... may properly be presumed to be a bargained-for benefit *and cannot accurately or speculatively be described as the product of employer largess,*" *Id.* at 355 (emphasis added) (citations omitted), i.e., exclusively employer-funded. Thus, because the disability retirement benefit was derived from the collective bargaining process, the Court held that the employer was not entitled to a credit or offset against the benefit. *Id.* at 356.[7]

In this instance, West, after a lapse of six months, received a bi-weekly Loss of License benefit via the plan required by the collective bargaining agreement between UPS, his employer, and the IPA, his union. In this regard, the president of IPA, Robert Miller, testified that such a bargaining process with UPS usually takes a couple of years and that both parties often had to make "trade-offs" in certain areas in order to bargain for things they found more important in other areas. With respect to the Loss of License benefit, Miller stated: "We negotiated, we traded off certain other areas [of value] that

---

6. The majority feels it important to note that workers' compensation benefits are not subject to income and payroll taxes. However, West's benefits *never exceeded* his normal wage during the time frame in which he received both workers' compensation and negotiated benefits. More importantly, UPS did not begin paying the negotiated benefits until they were due, *which was six months after he was unable to exercise his certificate to fly.*

7. The Court also held that no credit was authorized because "the terms of the plan ... did not provide substantial evidence that the disability retirement benefit fulfilled the same purpose as workers' compensation." *Barnes,* 906 S.W.2d at 356. Compare this to the loss of a pilot's license following a six-month waiting period for the start of benefits—an obvious benefit wholly unlike compensation.

we would have obtained in exchange for that benefit."[8]

Thus, under *Barnes*, 906 S.W.2d at 355, UPS would *not be entitled* to an offset because the Loss of License benefit derived from a collective bargaining agreement between the parties rather than solely employer largess. The majority, though, ignores this precedent under the guise of effectuating an assumed legislative intent behind KRS 342.730(6).

KRS 342.730(6), of course, was enacted more than a year after this Court rendered its decision in *Barnes*. However, and more importantly, *it was enacted following* the subsequent decision by the Court of Appeals in *Conkwright v. Rockwell International*, 920 S.W.2d 90, 91 (Ky. App.1996), *overruled by Williams v. Eastern Coal Corp.*, 952 S.W.2d 696 (Ky.1997).[9]

In *Conkwright*, the Court of Appeals allowed an employer to offset against a workers' compensation award amounts previously paid pursuant to a company-funded disability plan even though it derived from a union contract. In so doing, the court acknowledged *Barnes, id.* at 92, yet, nonetheless concluded that the company *was entitled to an offset*, primarily because the plan fulfilled the same purpose as workers' compensation:

> Conkwright argues that since the Rockwell disability plans were negotiated through a union contract, they constitute a bargained-for benefit of his contract of employment, and as such, the employer

is entitled to no credit. *We point out that whether the plan was part of a union-negotiated benefits package, and hence, not a product of employer largess, is but one factor to be considered. The real issue is whether the plan fulfills the same purpose as workers' compensation.* Both the sickness and accident plan and long-term disability plan in this case provide for a decrease in benefits for those periods in which the employee is eligible for workers' compensation by virtue of the same injury or disability. The plan considered in [*Barnes*] was silent as to the issue of credit under similar circumstances, and the Court determined that the plan did not fulfill the same purpose as workers' compensation.[10]

*Id.* (emphasis added).

Thus, I believe KRS 342.730(6)'s language was intended to encapsulate the principles discussed in *Barnes* rather than *Conkwright*. I say this because KRS 342.730(6) clearly reads:

> All income benefits otherwise payable pursuant to [Chapter 342] shall be offset by payments made under *an exclusively employer-funded disability or sickness and accident plan* which extends income benefits for the same disability covered by this chapter, except where the employer-funded plan contains an internal offset provision for workers' compensation benefits which is inconsistent with this provision.

---

**8.** As the Court of Appeals aptly noted, West *must pay union dues* for membership in the IPA in order to be eligible for receipt of the Loss of License benefits. If West were not a member of the IPA, but instead a non-union employee of UPS, he would not be entitled to receive such benefits, which further supports the idea that benefits negotiated through a collective bargaining process are contractual benefits distinct from exclusively employer-funded benefits.

**9.** *Barnes* was rendered on Sept. 21, 1995; *Conkwright* was rendered March 29, 1996; and KRS 342.730(6) was enacted in an extraordinary session of the General Assembly, effective December 12, 1996.

**10.** *See supra* note 2.

(Emphasis added). Based upon this statutory language, a court must make several determinations before it can conclude that a Chapter 342 income benefit can be offset by payments made under an employer-funded disability or sickness and accident plan, including that the plan is *exclusively employer-funded.*[11]

Moreover, contrary to the majority's opinion, this Court's recitation in *Barnes* is quite similar to the requirements of KRS 342.730(6), to wit:

> [W]hether an employer is entitled to a credit against its workers' compensation liability for benefits paid pursuant to a disability benefit plan depends upon all relevant factors. *Those factors include, but are not limited to, unilateral funding of the plan by the employer,* the duration and conditions of coverage under the plan, and whether the plan contains its own internal off-set provisions. *The fundamental question is whether the plan fulfills the same purpose as workers' compensation.* If so, then a

credit is proper in order to avoid a duplication of benefits.[12]

906 S.W.2d at 355 (emphasis added) (citation omitted). Again, both *Barnes* and KRS 342.730(6) enumerate exclusive/unilateral funding as a consideration with respect to whether an employer is entitled to a credit/offset against a workers' compensation award.[13] The only difference is that *Barnes* only deems the source of funding to be a factor, while subsection (6) renders it controlling.

Stated differently, had the subsection been enacted prior to *Conkwright*[14] and applied to the claims discussed therein, *see Williams,* 952 S.W.2d at 698 n. 1 ("[KRS 342.730](6) does not] affect the outcome of claims arising before [its] effective date"), the appellate court would have erred in allowing the offset because the fact that the disability plan was negotiated through a union contract and thus a bargained-for benefit would have been dispositive.

Thus, I believe KRS 342.730(6) and *Barnes* should be read in congruence.

---

11. The plan must also (1) extend income benefits for the same disability covered by workers' compensation and (2) not contain an internal offset provision for workers' compensation benefits which is inconsistent with KRS 342.730(6). The majority notes that the Loss of License benefit plan discussed herein contained no internal offset provision, but *they do not consider* whether the plan extended income benefits for the same disability covered by workers' compensation, presumably because neither the Court of Appeals nor the parties addressed the issue. *See also supra* note 2 which addresses this point.

12. In articulating the standard for determining whether an employer is entitled to a credit against a workers' compensation award, this Court pointed to its previous decision in *American Standard v. Boyd,* 873 S.W.2d 822 (Ky.1994). *Barnes,* 906 S.W.2d at 355. Not surprisingly, the language used in that case also parallels the passage cited from *Barnes:*
> We agree that entitlement to a credit must depend upon proof of all relevant

factors including, but not limited to, unilateral funding by the employer, duration and conditions of plan coverage, and whether the plan contains its own internal off-set provisions. See also, *Eastern Coal Corp. v. Mullins,* Ky.App., 845 S.W.2d 27 (1993). The credit is permitted in order to avoid double recovery. Therefore, it is fundamental that it be shown that the plan in question actually fulfills the same purpose as workers' compensation benefits.
*American Standard,* 873 S.W.2d at 823.

13. Both *Barnes* and the statute also discuss the similarity of the plan to workers' compensation and the presence of an internal offset provision.

14. As mentioned *supra* at note 4, *Conkwright* was rendered on March 29, 1996; KRS 342.730(6) was enacted effective December 12, 1996.

However, one question lingers: why, given *Barnes,* would the General Assembly enact this subsection? [15]

One important reason can be gleaned from this Court's decision in *Williams,* 952 S.W.2d 696. In that case, this Court departed from *Barnes* and held that benefits paid pursuant to an employer-provided benefit package "cannot be applied to reduce income benefits mandated by the workers' compensation act *absent some statutory authority to do so.*" 952 S.W.2d at 701 (emphasis added).[16] Importantly, although *Williams* was decided after subsection (6) was enacted, the claims (and questions presented) arose before the effective date. *Id.* at 697. As such, the offset provision was inapplicable. *Id.* at 698 n. 1 ("[KRS 342.730](6) does not] affect the outcome of claims arising before [its] effective date."). In short, *Williams* stood for the proposition that an employer is *never entitled* to a credit for an employer-funded benefit, regardless of whether it may be considered largess, *absent statutory authorization.*

Thus, by enacting KRS 342.730(6), the General Assembly set forth the statutory authorization necessary to allow an employer to claim credit against its workers' compensation liability, as required by *Williams.*[17] With this in mind, the provision does more than merely encapsulate the principles discussed in *Barnes*—it preserves and authorizes them!

In fact, a review of the legislative hearings held prior to the adoption of this law essentially confirms this. When the Commissioner of Insurance introduced KRS 342.730(6) to the House Committee on Labor and Industry, he noted the following:

What the provision does is, (1) *adopt the common law as developed by the courts,* but additionally it makes certain that in that situation—where there's a sickness and accident plan paid for by the employer—and workers' compensation benefits [inaudible], if the S & A plan doesn't prohibit it we're going to take credit for the workers' comp. The theory behind that is that the employer has paid for both, and that the employer should not be required to pay for the same disability twice.

[QUESTION:] Commissioner this does ... uh, it does uh, it's exclusively paid for by the employer ... the employer has a fund ... a union mine worker pays $4 a month out of his wages to the employer to fund that S & A benefit for himself in case he's hurt anywhere—on the job or off the job—but it doesn't ... but the plan doesn't have an internal offset provision in it, then his workers' comp would be deducted by that amount?

[ANSWER:] No. If *the employee pays the first dime* for the sickness and accident plan, there is no offset against workers' comp. If there is a 10 cent payment paid by the employee, and $190

---

**15.** Of course, the General Assembly has enacted statutes for the purpose of codifying case law. *See, e.g.,* KRS 505.020 (codifying the *Blockburger* test).

**16.** As a result, this Court withdrew the dicta set forth in *Barnes* and *American Standard* indicating that a credit for an employer-funded disability pension benefit might sometimes be authorized, and overruled *Beth–Elkhorn* and *Conkwright. Williams,* 952 S.W.2d at 701.

**17.** As this Court noted in *Williams,* "[t]here was formerly a provision in the act which allowed a credit against the award for payments made or supplies furnished by the employer in excess of those required by the act, i.e., as a result of the employer's largess." 952 S.W.2d at 699 (citing KRS 342.145). However, "[t]hat provision was repealed effective January 1, 1973." *Id.* (citation omitted).

by the employer, it doesn't make any difference ... there's simply no offset.

Audio tape: Hearing on Workers' Compensation Act in the Kentucky House of Representatives' Committee on Labor and Industry (December 3, 1996, Tape # 3, Side B) (on file with the author and available through the Legislative Research Commission) (emphasis added).

Clearly then, West's union traded other available benefits it could have bargained for this plan to benefit its pilots. Its pilots had to pay dues to receive these benefits. Thus, one cannot say it was exclusively employer-funded—it was traded for, value-for-value!

In light of the foregoing, I cannot agree the General Assembly sought to supersede *Barnes* with respect to the effect of collective bargaining agreements by enacting KRS 342.730(6). And by reversing the Court of Appeals in this instance, the majority ignores the parties' agreement, the legislative history, and our jurisprudence.[18]

Accordingly, I strongly dissent in the loss—even in part—of a valuable benefit bargained and traded for by IPA for its pilots.

NOBLE, J., joins.

---

**18.** I also note that the Court of Appeals' conclusion is supported by authority from other jurisdictions. For instance, in *Essick v. City of Springfield By and Through Board of Public Utilities of City of Springfield*, 680 S.W.2d 777, 778 (Mo.Ct.App.1984), the claimant had received "disability pay" pursuant to a collective bargaining agreement between a public utility company, his employer, and the International Brotherhood of Electrical Workers, his union. The Missouri Court of Appeals determined that the company was not entitled to an offset or credit against a workers' compensation award. *Id.* at 779. In so doing, the court noted that it had "recently held such payments made under a collective bargaining agreement are not solely on account of the injury and thus the employer is not entitled to a credit." *Id.* at 778 (citing *Evans v. Missouri Utils. Co.*, 671 S.W.2d 812, 816 (Mo.Ct.App. 1984)).